# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| GERALDINE IVERSON, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF BESSIE RITTER, | No.  50336-1-II |
| Appellant, | |
| v. | |
| PRESTIGE CARE, INC. and NORTHWEST COUNTRY PLACE, INC., | UNPUBLISHED OPINION |
| Respondents. | |

SUTTON, J. — Geraldine Iverson, personal representative of Bessie Ritter's estate, appeals

the superior court's orders granting summary judgment dismissal and denying reconsideration of

her medical negligence claim against a nursing home owned and operated by Prestige Care, Inc.

and Northwest Country Place, Inc. (collectively "NCPI").  Iverson alleges that NCPI's failure to

properly monitor and treat Ritter's constipation caused Ritter to develop a cecal volvulus[1] resulting

in her death.  NCPI argues that the medical causation opinion offered by Iverson's expert, Dr.

Teresa Brentnall, is a novel scientific theory subject to the *Frye*[2] test, and because the experts

---

[1] A "cecal volvulus" is a twist in the bowel resulting from the cecum being loose in the abdomen. A cecal volvulus occurs when the cecum, the first portion of the large intestine, loops around itself and creates a bowel obstruction.  Clerk's Papers at 336.

[2] *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923).

disagree as to whether her causation opinion is generally accepted in the medical community, the opinion is not admissible under *Frye*.

We hold that because Dr. Brentnall's causation opinion is based on a differential diagnosis, *Frye* is not implicated. Because Dr. Brentnall's causation opinion is admissible, there are genuine issues of material fact on causation. Thus, the superior court erred in granting summary judgment dismissal of Iverson's medical negligence claim. We reverse and remand for further proceedings.

## FACTS

On July 25, 2014, Ritter was admitted to NCPI, a nursing home in Centralia, Washington. The record reflects that in the 10 days between August 22 and September 1, she did not have a bowel movement. The facility did not treat Ritter's constipation until August 30 when she was given Milk of Magnesia. The following day she was given a Dulcolax suppository because she still had not had a bowel movement. On September 1, Ritter was admitted to the hospital after vomiting several times.

On September 2, Ritter underwent emergency surgery that showed a "[d]istal 15-20 cm of terminal ileum and cecum wrapped in it twisted closed loop obstruction with markedly nonviable ileocecal valve." Clerk's Papers (CP) at 425. The attending physician's postoperative diagnosis stated that Ritter had a bowel obstruction with cecal volvulus. Ritter died on September 4.

Following Ritter's death, Iverson sued NCPI for medical negligence and violation of the Abuse of Vulnerable Adults Act.[3] Iverson alleged that the NCPI staff failed to (1) monitor Ritter's bowel movements, (2) act on her lack of bowel movements, and (3) answer her call light. Iverson alleged that these failures caused Ritter's death; specifically, that NCPI's negligence in treating Ritter's constipation caused Ritter to develop a cecal volvulus that resulting in the rupture of her colon and, ultimately, her death. It is undisputed that Ritter died due to a cecal volvulus.

NCPI filed a motion for summary judgment dismissal. NCPI argued that Iverson failed to establish a prima facie case for medical negligence because she did not produce any admissible testimony from a qualified medical expert to explain that any of NCPI's agents or employees caused Ritter's death. In addition, NCPI argued that summary judgment dismissal was proper as a matter of law because Iverson relied on Dr. Brentnall's causation opinion which was not admissible under *Frye* because the opinion was based on a novel scientific theory which was not generally accepted by the medical community.

In support of its motion for summary judgment, NCPI provided the opinions of Dr. Michael Chiorean (a gastrointestinal specialist), Dr. Brant Oelschlager (a general gastrointestinal surgeon), and Dr. Michael Peters (a diagnostic radiologist). Dr. Chiorean explained that "[t]here's zero evidence that constipation leads to cecal volvulus." CP at 387. Dr. Oelschlager echoed this assertion and expounded that he was unaware of any "literature that shows that the short-term treatment of constipation in any way affects the development of cecal volvulus." CP at 436. Dr. Oelschlager further explained that cecal volvulus is not caused by constipation; rather, it occurs

---

[3] Iverson does not appeal the superior court's summary judgment dismissal of the Abuse of Vulnerable Adults Act, ch. 74.34 RCW, claim.

3

when the cecum is loose in the abdomen rather than attached. Dr. Peters also testified that constipation plays no causal role in the development of a cecal volvulus. He, like Dr. Oelschlager, stated that the only possible cause of cecal volvulus is that the cecum is not fixed in the abdomen in the right place.

In response to NCPI's motion for summary judgment, Iverson provided the declaration of Dr. Brentnall (a board-certified gastroenterologist). In her declaration, Dr. Brentnall stated that she reviewed "records from [the facility] for the admission beginning July 25, 2014 and records from Providence Centralia Hospital, including records from the admissions of August 19, 2014, and [of] September 1, 2014." CP at 482.

From those records Dr. Brentnall determined that Ritter suffered from constipation following her return to NCPI on August 22, as evidenced by the imaging study taken on September 1 at Providence Centralia Hospital. Additionally, she determined that Ritter went without a bowel movement between August 22 and September 1 because an oral contrast, administered on August 19, remained in her system when an imaging study was conducted on September 1. Dr. Brentnall stated that, "it is in my opinion more likely than not, that the untreated constipation of Bessie Ritter . . . led to her development of a cecal volvulus." CP at 484.

Iverson argued that under *Anderson*,[4] *Frye* is not implicated by an expert opinion on causation.

---

[4] *Anderson v. Akzo Nobel Coatings, Inc.*, 172 Wn.2d 593, 260 P.3d 857 (2011).

In response, NCPI argued that (1) Iverson failed to satisfy *Frye*, (2) Dr. Brentnall's expert opinion on causation is not admissible, (3) Iverson either misunderstood or misconstrued *Anderson*, (4) Dr. Brentnall's expert testimony was not based on the complete medical record because she did not consider Ritter's adhesions[5] as an alternative cause for her development of a cecal volvulus, and (5) Iverson failed to prove a genuine issue of material fact.

The superior court agreed with NCPI, granted summary judgment, and dismissed Iverson's medical negligence claim. Iverson filed a motion for reconsideration, which the superior court denied. Iverson appeals the orders granting summary judgment and denying reconsideration.[6]

ANALYSIS

Iverson argues that the superior court erred by granting summary judgment dismissal because under *Anderson*, *Frye* is not implicated when an expert's causation opinion is based on a differential diagnosis.[7] Thus, under *Anderson*, Dr. Brentnall's causation opinion is admissible and her opinion creates genuine issues of material fact on causation rendering summary judgment dismissal improper. We hold that because Dr. Brentnall's causation opinion is based on a differential diagnosis, *Frye* is not implicated.

---

[5] "Adhesions" are bands of scar tissue. CP at 556.

[6] Iverson did not provide any arguments to support her challenge to the order denying reconsideration; therefore, we do not consider this issue. RAP 12.1(a).

[7] *Anderson*, 172 Wn.2d at 597.

No. 50336-1-II

## I. STANDARDS OF REVIEW

We review a grant of summary judgment de novo, viewing the facts and reasonable inferences in the light most favorable to the nonmoving party. *Keck v. Collins*, 184 Wn.2d 358, 368, 357 P.3d 1080 (2015). Summary judgment dismissal is proper only when the pleadings, depositions, and admissions in the record, together with any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. CR 56(c); *Young v. Key Pharms., Inc.*, 112 Wn.2d 216, 225-26, 770 P.2d 182 (1989). The purpose of a summary judgment motion is to avoid an unnecessary trial where no genuine issue as to a material fact exists. *Young*, 112 Wn.2d at 225-26.

The moving party bears the initial burden of showing there are no genuine issues of material fact. *Rounds v. Nellcor Puritan Bennett, Inc.*, 147 Wn. App. 155, 162, 194 P.3d 274 (2008). If the moving party meets its burden of producing factual evidence showing that it is entitled to judgment as a matter of law, the burden shifts to the nonmoving party to "'produce evidence sufficient to support a reasonable inference that the [moving party] was negligent.'" *Rounds,* 147 Wn. App. at 162 (quoting *Seybold v. Neu*, 105 Wn. App. 666, 676, 19 P.3d 1068 (2001)). To make the requisite showing, the party opposing summary judgment must submit "competent testimony setting forth specific facts, as opposed to general conclusions[,] to demonstrate a genuine issue of material fact." *Thompson v. Everett Clinic*, 71 Wn. App. 548, 555, 860 P.2d 1054 (1993).

Summary judgment is proper in a medical negligence case if the plaintiff fails to produce competent medical expert testimony establishing that the injury was proximately caused by a failure to comply with the applicable standard of care. *Rounds*, 147 Wn. App. at 162-63 (citing *Seybold*, 105 Wn. App. at 676).

## II. *FRYE* IS NOT IMPLICATED

### A. APPLICABILITY OF *ANDERSON*

Our Supreme Court in *Anderson* explained when *Frye* is implicated. *Anderson* held that "the *Frye* test is not implicated if the theory and the methodology relied upon and used by the expert to reach an opinion on causation is generally accepted by the relevant scientific community." *Anderson v. Alzo Nobel Coatings, Inc.*, 172 Wn.2d 593, 597, 260 P.3d 857 (2011). "[I]f the science and methods are widely accepted in the relevant scientific community, the evidence is admissible under *Frye*, without separately requiring widespread acceptance of the plaintiff's theory of causation." *Anderson*, 172 Wn.2d at 609. This is because "[m]any medical opinions on causation are based upon differential diagnoses." *Anderson*, 172 Wn.2d at 610. The Frye test is implicated only where the opinion on causation is based on novel science. *Anderson*, 172 Wn.2d at 611.

A physician "may base a conclusion about causation through a process of ruling out potential causes with due consideration to temporal factors, such as events and the onset of symptoms." *Anderson*, 172 Wn.2d at 610. *Anderson* further explained that

> [I]f the science and methods are widely accepted in the relevant scientific community, the evidence is admissible under *Frye*, without separately requiring widespread acceptance of the plaintiff's theory of causation. Of course the evidence must also meet the other evidentiary requirements of competency, relevancy, reliability, helpfulness, and probability.

. . . .

> Many expert medical opinions are pure opinions and are based on experience and training rather than scientific data. We require only that "medical expert testimony . . . be based upon a reasonable degree of medical certainty" or probability.

*Anderson*, 172 Wn.2d at 609-10 (citations omitted, internal quotation marks omitted) (quoting

*McLaughlin v. Cooke*, 112 Wn.2d 829, 836, 774 P.2d 1171 (1989)).

Here, Dr. Brentnall conducted a differential diagnosis of Ritter's symptoms by reviewing

"the events that led to the cecal volvulus that was the immediate cause of Ms. Ritter's demise."

CP at 485. She considered Ritter's medical records along with her own experience, education, and

training as a board certified gastroenterologist with 20 years of experience. CP at 481-82. In her

declaration, Dr. Brentnall stated that she reviewed "records from [the facility] for the admission

beginning July 25, 2014 and records from Providence Centralia Hospital, including records from

the admissions of August 19, 2014, and [of] September 1, 2014." CP at 482.

Dr. Brentnall explained that from those records she determined that Ritter suffered from

constipation following her return to NCPI on August 22, as evidenced by the imaging study taken

on September 1 at Providence Centralia Hospital. Additionally, she determined that Ritter went

without a bowel movement between August 22 and September 1 because an oral contrast,

administered on August 19, remained in her system when an imaging study was conducted on

September 1.

Through the process of differential diagnosis, Dr. Brentnall opined that "the untreated

constipation of Bessie Ritter during the period between [August 22] and [September 1] led to her

development of a cecal volvulus." CP at 484. Because Dr. Brentnall's causation theory is based

on a differential diagnosis, a process well accepted in the medical community, her opinion does not implicate *Frye*.

NCPI's experts, Drs. Chiorean, Oelschlager, and Peters, disagreed with Dr. Brentnall's conclusion that constipation causes a cecal volvulus, but they did not disagree with Dr. Brentnall's underlying methodology. Because the experts have differing opinions on causation, there are genuine issues of material fact. Because there are genuine issues of material fact on causation, and viewing the facts and inferences in the light most favorable to the nonmoving party, we hold that the superior court erred in granting summary judgment dismissal. Thus, we reverse the order of summary judgment dismissal of the medical negligence claim and remand for further proceedings.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

SUTTON, J.

We concur:

LEE, A.C.J.

BJORGEN, J.

9